ACCEPTED
15-24-00118-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/18/2024 2:53 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00118-CV

# COURT OF APPEALS FOR THE FIFTEENTH DISTRICT OF TEXAS AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/18/2024 2:53:38 PM
CHRISTOPHER A. PRINE
Clerk

**Aspire Power Ventures, LP,**

*Appellant,*

v.

**Public Utility Commission of Texas, Electric Reliability Council of Texas, Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman,**

*Appellees.*

_____

**On Appeal from the 345th Judicial District Court
Travis County, Texas
Cause No. D-1-GN-24-003384
*Hon. Catherine A. Mauzy, Presiding***

_____

## APPELLANT'S BRIEF

_____

Chrysta L. Castañeda
  Texas Bar No. 15325625
  chrysta@castaneda-firm.com
Nicole Michael
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
Brent M. Rubin
Ken Carroll
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: (214) 855-3000
Fax: (214) 580-2641

*Attorneys for Appellant Aspire Power Ventures, LP*

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.1(a), below is a complete list of all parties to the order being appealed and the names and addresses of all trial and appellate counsel:

### 1. Trial Court

The Honorable Catherine A. Mauzy, *Judge Presiding*[1]
345th Judicial District Court
     Travis County, Texas
1700 Guadalupe, 10th floor
Austin, TX 78701

### 2. Appellant and Counsel

| *Plaintiff–Appellant* | *Counsel* |
|---|---|
| Aspire Power Ventures, LP | Chrysta L. Castañeda<br>Nicole Michael<br>THE CASTAÑEDA FIRM<br>325 N. St. Paul, Suite 2030<br>Dallas, Texas 75201<br><br>Monica Latin<br>Brent M. Rubin<br>Ken Carroll<br>CARRINGTON, COLEMAN,<br>  SLOMAN & BLUMENTHAL, L.L.P.<br>901 Main Street, Suite 5500<br>Dallas, Texas 75202 |

---

[1] Judge Mauzy is the judge of the 419th District Court of Travis County, Texas. She sat as the presiding judge in the 345th District Court in this case, however, pursuant to Travis County Local Rule 10.2. *See* Assignment by Presiding Judge, June 11, 2024. Appx.34.

### 3. Appellees and Counsel

| *Defendants–Appellees* | *Counsel* |
| --- | --- |
| Public Utility Commission of Texas, and Thomas Gleeson Lori Cobos Jimmy Glotfelty Kathleen Jackson Courtney Hjaltman, In their official capacities as Chairman and Commissioners of The Public Utility Commission of Texas | Ken Paxton, Attorney General of Texas Brent Webster, First Ass't Attorney General Ralph Molina, Deputy First Ass't Attorney General James Lloyd, Deputy Attorney General for Civil Litigation Office of the Attorney Geneal P.O. Box 12548 Austin, TX 78711-2548 |
| | John R. Hulme, Special Counsel Amanda Atkinson Cagle, Ass't Attorney General Jordan Pratt, Ass't Attorney General Kellie E. Billings-Ray, Chief, Environmental Protection Division Office of the Attorney General P.O. Box 12548, MC-066 Austin, TX 78711-2548 |
| Electric Reliability Council of Texas | Elliot Clark Elin Isenhower WINSTEAD PC 600 W. 5th Street, Suite 900 Austin, TX 78701 |

3

# TABLE OF CONTENTS

**Page**

Identity of Parties and Counsel ....................................................... 2

Table of Contents ........................................................................... 4

Table of Authorities........................................................................ 7

Record References ........................................................................ 12

Statement of the Case .................................................................. 13

Statement Regarding Oral Argument ........................................... 14

Issue Presented ............................................................................ 15

Introduction.................................................................................. 16

Statement of Facts and Procedural History .................................. 18

I.     Factual Background................................................................. 18

     A.    The PUC and ERCOT ............................................... 18

     B.    About Aspire Power Ventures.................................... 20

     C.    The mechanics of PUC and ERCOT rulemaking ................. 21

     D.    The ERCOT Contingency Reserve Service (ECRS)............. 22

          1.    The PUC, itself, did not authorize ECRS as a new ancillary service prior to ERCOT's ECRS rulemaking, as required by statute. ........................... 24

          2.    ECRS constitutes withholding of electricity, contrary to PURA.......................................... 25

          3.    The ECRS rulemaking failed to meet the requirements of the APA. ........................................ 27

II.    Procedural History ................................................................. 29

Summary of the Argument ................................................... 31

Standard of Review ............................................................ 34

Argument............................................................................ 37

I.    Government Code § 2001.038 waives sovereign or
governmental immunity for challenges to the validity of a
"rule," as defined by the APA....................................... 38

    A.    Challenges to rules adopted by the PUC itself fall
within § 2001.038. ................................................. 40

    B.    The PUC delegated its authority to formulate and
adopt certain rules to ERCOT—providing the only
authority ERCOT had to adopt such rules. .......................... 42

    C.    When ERCOT adopted NPRRs under rulemaking
authority delegated by the PUC, it acted as and stood
in the shoes of the PUC and was subject to the same
requirements and limitations as the PUC—including
the APA generally and § 2001.038 specifically..................... 44

    D.    *RWE* does not undermine Aspire's reliance on
§ 2001.038 as a waiver of sovereign immunity with
respect to its challenge to the ECRS Rules. ......................... 51

    E.    PURA's directive that ERCOT be required to establish
a "formal process" for its PUC-delegated rulemaking
authority does not supplant the APA. ................................. 55

II.    Aspire was not required to "exhaust administrative
remedies" before pursuing its challenge in the district court. ...... 59

III.    In addition, and in the alternative, sovereign immunity does
not bar Aspire's *ultra vires* claims against the PUC
Commissioners. ........................................................... 60

Conclusion & Prayer for Relief ............................................. 65

Certificate of Compliance .................................................... 67

Certificate of Service .............................................................. 68

APPENDIX

Tab A:      Order Granting PUC Parties' Amended Plea to the
            Jurisdiction, Appx.726
Tab B:      Order Granting ERCOT Amended Plea to the
            Jurisdiction, Appx.723
Tab C:      Tex. Gov't Code § 2001.003
Tab D:      Tex. Gov't Code § 2001.038
Tab E:      Tex. Util. Code § 35.004
Tab F:      Tex. Util. Code § 39.151

**Cases**                                                **Page(s)**

*Aspire Power Ventures, L.P. v. PUC*,
No. 03-24-00102-CV (Tex. App.—Austin) ..........................................29

*Aspire Power Ventures, L.P. v. PUC*,
No. 15-24-00035-CV, 2024 WL 4293602 (Tex. App.—15th
Dist., Sept. 26, 2024, no pet.).............................................................29

*Bd. of Trustees of Ohio State Univ. v. Dept of Admin. Svcs.*,
429 N.E.2d 428 (Ohio 1981)................................................................47

*City of Garland v. Byrd*,
97 S.W.3d 601 (Tex. App.—Dallas 2002, pet. denied)........................46

*City Pub. Serv. Bd. of San Antonio v. PUC*,
9 S.W.3d 868 (Tex. App.—Austin 2000), *aff'd*, 53 S.W.3d
310 (Tex. 2001).....................................................................................41

*CPS Energy v. Elec. Reliability Council of Tex.*,
671 S.W.3d 605 (Tex. 2023) .................................................................19

*DuPuy v. City of Waco*,
396 S.W.2d 103 (Tex. 1965) .................................................................49

*EBS Sols., Inc. v. Hegar*,
601 S.W.3d 744 (Tex. 2020) ..........................................................35, 36

*Gonzalez v. Tex. Med. Bd.*,
No. 03-22-00205-CV, 2023 WL 7134982 (Tex. App.—
Austin Oct. 31, 2023, pet. filed)..........................................................57

*Hartzell v. S.O.*,
672 S.W.3d 304 (Tex. 2023) .................................................................61

*Herrera v. Mata*,
No. 23-0457, 2024 WL 4996715
(Tex. Dec. 6, 2024) (per curiam) ...................................18, 35, 35, 62

*Houston Belt & Terminal Ry. Co. v. City of Houston*,
487 S.W.3d 154 (Tex. 2016) ....................................................... 34, 61

*Lehmann v. Har-Con Corp.*,
39 S.W.3d 191 (Tex. 2001) ................................................................ 31

*Lindsay v. Sterling*,
690 S.W.2d 560 (Tex. 1985) ....................................................... 46, 47

*Mainland Sav. Ass'n v. Hoffbrau Steakhouse, Inc.*,
659 S.W.2d 101 (Tex. App.—Houston [14th Dist.]
1983, no writ) ................................................................................... 49

*Mednick v. Tex. State Bd. Pub. Accountancy*,
933 S.W.2d 336 (Tex. App.—Austin 1996, writ denied) .................... 47

*Mosley v. Tex. Health & Human Services Comm'n*,
593 S.W.3d 250 (Tex. 2019) .............................................................. 56

*PUC v. AMA Commc'ns, LLC*,
No. 03-21-00597-CV, 2022 WL 3220405 (Tex. App.—
Austin Aug. 10, 2022, no pet.) .................................................. *passim*

*PUC v. RWE Renewables Americas, LLC*,
691 S.W.3d 484 (Tex. 2024) ...................................................... *passim*

*Sw. Bell Tel. Co. v. PUC*,
888 S.W.2d 921 (Tex. App.—Austin 1994, writ denied) .............. 40, 62

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) .............................................................. 36

*Tex. Dep't of Protective & Regulatory Services v. Mega Child
Care, Inc.*,
145 S.W.3d 170 (Tex. 2004) .............................................................. 47

*Tex. Dep't of State Health Services v. Balquinta*,
429 S.W.3d 726 (Tex. App.—Austin 2014, pet. dism'd) ............... 32, 39

*Tex. Dep't of State Health Services v. Sky Mktg. Corp.*,
No. 03-21-00571-CV, 2023 WL 6299115 (Tex. App.—
Austin Sept. 28, 2023, pet. filed) ......................................................61

*Tex. Tel. Ass'n v. PUC*,
653 S.W.3d 227 (Tex. App.—Austin 2022, no pet.) .................... *passim*

*Texas Dep't of Transp. v. Sunset Transp., Inc.*,
357 S.W.3d 691 (Tex. App.—Austin 2011, no pet.) ...................... 32, 39

*Usher v. Cnty. of Monterey*,
65 Cal. App. 4th 210, 76 Cal. Rptr. 2d 274 (1998), *as
modified* (June 23, 1998) ...................................................................49

*Watkins v. City of Santa Ana*,
189 Cal. App. 3d 393, 234 Cal. Rptr. 406 (Ct. App. 1987) .................49

**Statutes & Rules**

Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15 ......................22, 43

Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex.
Gen. Laws 830, 831 ......................................................................22, 43

Act of May 27, 1999, 76th Leg., R.S., ch. 405 § 39, 1999 Tex.
Gen. Laws 2543, 2558 ........................................................................19

Tex. Gov't Code § 411.180 ......................................................................57

Tex. Gov't Code § 2001.001 ....................................................................56

Tex. Gov't Code § 2001.003 .............................................. 37, 41, 42, 44

Tex. Gov't Code § 2001.023 ..............................................................27, 58

Tex. Gov't Code § 2001.024 ..............................................................27, 58

Tex. Gov't Code § 2001.033 ..............................................................27, 58

Tex. Gov't Code § 2001.038 ........................................................ *passim*

Tex. Gov't Code § 2001.221 ....................................................................58

Tex. Gov't Code § 2001.227 ........................................................58

Tex. Hum. Res. Code § 40.063 ....................................................57

Tex. Parks & Wild. Code § 32.006 ..............................................57

Tex. Util. Code § 35.004 ................................................ 25, 63, 64

Tex. Util. Code § 39.001 ........................................ 29, 33, 51, 53

Tex. Util. Code § 39.151 ..................................................... *passim*

Tex. Util. Code § 39.157 ................................................ 25, 62, 63

Tex. Util. Code § 39.159 ..............................................................64

16 Tex. Admin. Code § 25.361........................................................19

16 Tex. Admin. Code § 25.362.......................................... 19, 21, 42

16 Tex. Admin. Code § 25.365........................................................26

16 Tex. Admin. Code § 25.501.................................................. 25, 62

16 Tex. Admin. Code § 25.503.................................................. 25, 63

Tex. R. App. P. 9.4 ........................................................................67

Tex. R. App. P. 34.5a ....................................................................12

Tex. R. App. P. 38.1(a).....................................................................2

Tex. R. Civ. P. 91a ................................................................. 13, 30

Travis County Local Rule 10.2........................................................2

**Other Authorities**

ABOUT THE PUC, *available at*
    https://www.puc.texas.gov/agency/about/mission.aspx......................19

BLACK'S LAW DICTIONARY (12th ed. 2024) .............................................50

ERCOT Board Report, NPRR 1196 .....................................................24

ERCOT Market Notice, M-C100923-0330 General,
ERCOT Membership Application for 2024 Membership
Year - FINAL REMINDER
(Nov. 13, 2023), *available at*
https://www.ercot.com/services/comm/mkt_notices/M-
C100923-03 ...................................................................................... 28

https://www.ercot.com/files/docs/2023/12/11/13%20Independe
nt%20Market%20Monitor%20(IMM)%20Report.pdf .......................... 26

https://www.potomaceconomics.com/wp-
content/uploads/2024/05/2023-State-of-the-Market-
Report_Final_060624.pdf ................................................................... 26

https://www.potomaceconomics.com/wp-
content/uploads/2024/05/2023-State-of-the-Market-
Report_Final_060624.pdf ................................................................... 26

## RECORD REFERENCES

**Appendix in Lieu of Clerk's Record**

The separate Appendix in Lieu of Clerk's Record, *see* Tex. R. App. P. 34.5a, is consecutively page-numbered and will be cited by "Appx" and page, *e.g.*, Appx.726.

**Reporter's Record**

The Reporter's Record ("RR") will be cited by volume and page, *e.g.*, 1RR.25.

## STATEMENT OF THE CASE

*Nature of the Underlying Case:*

Plaintiff–Appellant Aspire Power Ventures, LP filed suit challenging the validity of the rules establishing and amending the ERCOT Contingency Reserve Service ("ECRS"), promulgated by the Public Utility Commission of Texas (the "PUC") and the Electric Reliability Council of Texas ("ERCOT"), to which the PUC delegated certain of its rulemaking authority.

*Trial Court:*

The Honorable Catherine A. Mauzy, Judge of the 419th Judicial District Court, Travis County, Texas, sitting as the Presiding Judge for this case in the 345th Judicial District Court, Travis County, Texas.

*Course of Proceedings Below:*

ERCOT and the PUC Defendants filed original and amended pleas to the jurisdiction, asking the trial court to dismiss Aspire's claims based sovereign or governmental immunity and Aspire's purported failure to exhaust administrative remedies. Appx.74, 180, 304, 416. ERCOT also filed, in the alternative, a motion to dismiss under Tex. R. Civ. P. 91a and a plea in abatement. Appx.74, 304, 325. After briefing and a hearing, the trial court granted Defendants' amended pleas to the jurisdiction and dismissed the case. It did not reach ERCOT's alternative motion to dismiss and plea in abatement.

*Order on Appeal:*

The trial court's Orders Granting Defendants' Amended Pleas to the Jurisdiction, dated October 21, 2024. Appx.723, 726.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Aspire Power Ventures requests oral argument. This appeal turns on novel questions about (1) the Texas Legislature's waiver of sovereign or governmental immunity for challenges to the validity of rules, like those establishing and amending ECRS, promulgated by an entity acting under authority delegated to it by a state agency, and (2) the interpretation and application of recent decisions of the Supreme Court of Texas, including *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024). Aspire believes the Court will benefit from oral argument on these issues.

## ISSUE PRESENTED

Whether the trial court erred in concluding it lacked jurisdiction over Plaintiff Aspire's claims for ERCOT's and the PUC's failure to follow the Administrative Procedure Act and for exceeding statutory authority in establishing and amending the ECRS rules or protocols.

## INTRODUCTION

The ERCOT Contingency Reserve Service ("ECRS"), which is the focus of this case, artificially restrains the supply of electricity available to Texans and suppresses competition in the Texas electricity markets. Under ECRS, companies that generate electricity are paid to withhold some of their existing generating capacity from the grid—to hold it in "reserve"—even when electricity demand is at a peak, such as in hot summer months. Because of ECRS, Texas consumers and other market participants have paid inflated rates for electricity they wouldn't have had to pay under normal, competitive-market conditions.

What's more, the administrative rules creating and modifying ECRS were adopted and approved without compliance with the Texas Administrative Procedure Act, which ensures that the public can meaningfully participate in rulemaking and that rules don't exceed limits set by the Legislature. Here, ERCOT adopted the ECRS Rules under authority purportedly delegated to it by the PUC. The PUC would have had to comply with the APA if it adopted the ECRS Rules. ERCOT therefore also had to follow the APA when standing in PUC's shoes as its delegee.

16

Because ERCOT adopted the ECRS Rules without following the APA, Aspire, a participant in the Texas wholesale electricity market, sued ERCOT as well as the PUC and its Commissioners, which approved several of the ECRS Rules after ERCOT adopted them. In addition to alleging that the ECRS Rules did not comply with the APA, Aspire also alleged that ECRS contravenes the Public Utility Regulatory Act.

ERCOT and the PUC responded with pleas to the jurisdiction, arguing that Aspire's claims were barred by sovereign immunity and by Aspire's alleged failure to exhaust administrative remedies before bringing its claims to court. For those arguments, they relied almost exclusively on the Supreme Court of Texas's recent opinion in *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024).

But *RWE* does not bar Aspire's claims in this case or the district court's jurisdiction over them. *RWE* did not deal with the primary mechanism by which Aspire brought its claims to court, Texas Government Code § 2001.038, which expressly (i) waives sovereign immunity for claims like those asserted by Aspire, challenging the validity of agency rules, and (ii) negates any requirement that

administrative remedies be exhausted before such a validity challenge may be brought to court. Nor did *RWE* address Aspire's second basis for attacking the ECRS rules—i.e., that they are the product of *ultra vires* conduct by the PUC Commissioners, with respect to which sovereign immunity does not even arise. *See Herrera v. Mata*, No. 23-0457, 2024 WL 4996715, at \*2 (Tex. Dec. 6, 2024) (per curiam).

Because the Legislature expressly waived sovereign immunity and eliminated the requirement that administrative remedies be exhausted for claims like those asserted by Aspire, and because sovereign immunity does not apply to Aspire's *ultra vires* claims, the orders of the district court granting ERCOT's and the PUC's jurisdictional pleas should be reversed and the case remanded to be resolved on the merits.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.    Factual Background

#### A.    The PUC and ERCOT

In 1975, the Texas Legislature enacted the Public Utility Regulatory Act ("PURA") and created the PUC "to provide statewide regulation of the rates and services of electric and telecommunications

utilities."[2] Then, "[i]n 1999, the Legislature restructured the electric utility industry in Texas. It amended PURA to … establish[] a fully competitive electric power industry." *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 612 (Tex. 2023) (citing Act of May 27, 1999, 76th Leg., R.S., ch. 405 § 39, 1999 Tex. Gen. Laws 2543, 2558)[3]; *see* Appx. 274 ¶ 17.

PURA § 39.151(a)—enacted as part of the 1999 restructuring— required the PUC to "certify an independent organization" or "independent system operator" ("ISO") to perform certain functions essential to the operation of the Texas electricity grid. The PUC designated and certified ERCOT as that "independent organization" in 2001. *See* Tex. Admin. Code §§ 25.361, 25.362. As a certified "independent organization" or ISO, ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee [its] operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs

---

[2] ABOUT THE PUC, *available at* https://www.puc.texas.gov/agency/about/mission.aspx.

[3] PURA is codified in the Texas Utilities Code. The 1999 restructuring amendments appear in Chapter 39 of that Code.

the organization's functions and duties." Tex. Util. Code § 39.151(d).

The PUC, in other words, acts through ERCOT.

## B.     About Aspire Power Ventures

Aspire is a Market Participant—specifically, a Qualified Scheduling Entity ("QSE")—that operates in several markets administered by ERCOT. Aspire buys and sells wholesale electricity in ERCOT's real-time electricity market, serving as a conduit between companies that generate electricity and companies that sell electricity on a retail basis. Appx.277 ¶¶ 25-26.

QSEs like Aspire bear the risk of price fluctuations in the real-time electricity market, because they contractually commit in advance to buy and sell electricity at specific prices before the actual wholesale market prices are determined through processes and procedures implemented by ERCOT. Appx.277-78 ¶ 27. As a result, artificial fluctuations in prices—administratively-created shifts that don't reflect normal drivers of the market like changes in weather, demand, and generation—cause prices to deviate from otherwise reasonable expectations. *Id.* Because they are unexpected and not the product of

20

the competitive market, these artificial fluctuations represent an additional risk to QSEs like Aspire. *Id.*

### C. The mechanics of PUC and ERCOT rulemaking

PURA § 39.151(d) directs that the PUC "shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." But § 39.151(d) also provides that the PUC "may delegate those responsibilities to an independent organization." The PUC delegated that rulemaking authority to ERCOT. *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484, 486 (Tex. 2024); 16 Tex. Admin. Code § 25.362(c).

So, Texas's electricity market is governed in relevant part by "Nodal Protocols," rules promulgated by ERCOT, not in its own right, but under the rulemaking authority delegated to it by the PUC. *See* Tex. Util. Code § 39.151(d). Section 21 of ERCOT's Nodal Protocols details the process for adopting new protocols and revising existing ones. Appx.275 ¶ 19. A request to modify a Nodal Protocol is called a Nodal Protocol Revision Request or "NPRR." *Id.*

Under a further amendment to PURA in June 2021, Nodal Protocols "adopted" by ERCOT must then be "approved" by the PUC through a separate order for those rules or "protocols" to take effect. Tex. Util. Code § 39.151(g-6); *see* Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15. Before PURA was amended in 2021 to require PUC approval of NPRRs, however, those rules became effective when adopted by ERCOT. *RWE*, 691 S.W.3d at 486-87.

### D. The ERCOT Contingency Reserve Service (ECRS)

One product of ERCOT's purported rulemaking authority is the ERCOT Contingency Reserve Service or "ECRS." In a nutshell, under ECRS, ERCOT pays generators who participate in the program to withhold part of their generating capacity as reserves unless and until certain operational criteria are met. Appx.270 ¶ 2, 279 ¶ 30. ERCOT contends ECRS "was developed to address certain reliability risks" in the Texas electricity grid, Appx.313, *see* Appx.421—although, as discussed below, it does not foster reliability in practice.

ECRS was created and adopted by ERCOT in February 2019 as a new "ancillary service" through NPRR 863, ostensibly under

22

rulemaking authority delegated to ERCOT by the PUC. Appx.278-79 ¶ 29. After almost five years of development, ECRS was finally implemented in June 2023. *Id*. ¶¶ 28-29. Between the 2019 creation of ECRS and the present, the PUC and ERCOT have modified it through numerous ECRS-related NPRRs, as shown in Table 1 below ("ECRS Rules"). *See id*. ¶ 29. Many of these ECRS Rules made substantive modifications; others were adopted to "clean up" ERCOT protocol language. *Id*.

**TABLE 1**

| ERCOT NPRR | PUC Approval Orders | Date Adopted |
|---|---|---|
| NPRR 863 – Creation of ECRS and Revisions to Responsive Reserve | N/A[4] | Feb. 12, 2019 |
| NPRR 992 – Updated Day-Ahead Liability for NPRR863 | N/A | Aug. 11, 2020 |
| NPRR 1015 – Clarification of DAM implementation of NPRR863 Phase 2 | N/A | Aug. 11, 2020 |
| NPRR 1079 – Day-Ahead Market RRS/ECRS 48 Hour Report Clarification (Aug. 10, 2021) | Approval Order (PUC Project No. 52307) | Aug. 24, 2021 |
| NPRR 1096 – Require | Approval Order | May 12, 2022 |

---

[4] NPRR 863, NPRR 992, and NPRR 1015 were adopted by ERCOT before PURA was amended in 2021 to require the PUC's review and approval of NPRRs before they would become effective. *See supra* at 22.

23

| | | |
|---|---|---|
| Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (April 28, 2022) | (PUC Project No. 52934) | |
| NPRR 1148 – Language Cleanup Related to ECRS (Dec. 20, 2022) | Approval Order (PUC Project 54445) | Jan. 26, 2023 |
| NPRR 1178 – Expectations for Resources Providing ECRS (Jun. 20, 2023) | Approval Order (PUC Project 54445) | June 29, 2023 |
| NPRR 1196 – Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (Dec. 19, 2023) | Approval Order (PUC Project No. 54445) | Feb. 1, 2024 |
| NPRR 1213 – Allow DGRs and DESRs on Circuits Subject to Load Shed to Provide ECRS and Clarify Language Regarding DGRs and DESRs Providing Non-Spin (Feb. 27, 2024) | Approval Order (PUC Project No. 54445) | Apr. 11, 2024 |
| NPRR 1224 – ECRS Manual Deployment Triggers (June 18, 2024) | Rejection Order (PUC Project No. 54445) | Aug. 5, 2024 |

> **1. The PUC, itself, did not authorize ECRS as a new ancillary service prior to ERCOT's ECRS rulemaking, as required by statute.**

By ERCOT's own characterization, ECRS was a new type of "ancillary service." *See, e.g.*, ERCOT Board Report, NPRR 1196 ("The Protocols changes approved in NPRR 1149 included provisions that would go into effect upon implementation of the new Ancillary Service,

24

ERCOT Contingency Reserve Service (ECRS)."); Appx.313; *see* Appx.283 ¶¶ 39-41. PURA provides that ancillary services like ECRS must be created "by rule" by the PUC itself. *See* Tex. Util. Code § 35.004(e). PURA § 39.151(d) does not authorize the PUC to delegate that particular rulemaking authority to an "independent organization" like ERCOT.[5] But ERCOT's NPRR 863, which created ECRS, was never adopted by the PUC, as a rule or otherwise, and necessarily exceeded ERCOT's authority when issued. Appx.283 ¶¶ 39-41. Further, all subsequent ERCOT protocols modifying ECRS, and PUC approvals of such protocols, rested on ERCOT's initial, unauthorized creation of ECRS. *Id.*

> **2.  ECRS constitutes withholding of electricity, contrary to PURA.**

At its core, ERCOT's ECRS program pays entities that generate electricity to withhold generating capacity that could (and likely would) otherwise be made available to the grid to meet the demands of the market. *See* Appx.279-80 ¶ 30. But PURA identifies the withholding of production as a prohibited market-power abuse. Tex. Util. Code § 39.157(a); 16 Tex. Admin. Code §§ 25.501(j), 25.503(a)(6), (d); *see*

---

[5] *See* Argument, Part III, below.

Appx.279-80 ¶ 30. As noted, the PUC and ERCOT claim that ECRS is a "critical reliability tool" developed to address certain reliability risks not adequately covered by ERCOT's other ancillary services. Appx.313, 421. But ERCOT's Independent Market Monitor ("IMM") determined that ECRS has actually "diminished reliability."[6] Appx.280 ¶ 32. As explained in the IMM's State of the Market Report published in May 2024, ECRS caused ERCOT to hold generating capacity back from the real-time market even when it was needed to meet energy demand or manage congestion.[7] Appx.280 ¶ 32. The increased generating capacity that ERCOT kept off the market via ECRS "substantially exceeded levels that could be justified by reliability."[8] *See* Appx.288 ¶ 53. ECRS caused artificial electricity shortages that produced massively inflated costs for electricity sold on the wholesale market, totaling more than $12 billion between June and November of 2023. *Id*.

---

[6]https://www.ercot.com/files/docs/2023/12/11/13%20Independent%20Market%20Monitor%20(IMM)%20Report.pdf (slide 6); *see also* 16 Tex. Admin. Code § 25.365 (prescribing the IMM's role and responsibilities, which include evaluation of rules and protocols that affect supply, demand, and the efficient functioning of the ERCOT market.)

[7]https://www.potomaceconomics.com/wp-content/uploads/2024/05/2023-State-of-the-Market-Report_Final_060624.pdf at pp. xix, 24.

[8]https://www.potomaceconomics.com/wp-content/uploads/2024/05/2023-State-of-the-Market-Report_Final_060624.pdf, at p. 26.

### 3. The ECRS rulemaking failed to meet the requirements of the APA.

Before 2021, as noted above, ERCOT could and did promulgate NPRRs without specific prior authorization or subsequent approval by the PUC. From June 2021 on, the PUC had to issue approval orders before NPRRs, including the ECRS Rules, could take effect. But at no point has the process complied with the requirements of the APA, omitting, among other things:

- Posting of a notice of proposed rulemaking in the Texas Register with at least 30 days' notice to the public
- A notice of proposed rulemaking that meets all of the requirements of the APA, including:
    - A statement of the statutory or other authority under which the rule is proposed to be adopted
    - A fiscal note showing the name and title of the officer or employee responsible for preparing or approving the note and stating for each year of the first five years that the rule will be in effect its impact on state and local government
- A notice of agency adoption posted in the Texas Register that complies with all of the requirements of the APA, including a reasoned justification for the rule.

*See* Tex. Gov't Code §§ 2001.023, 2001.024, 2001.033.

Moreover, the process used to adopt the ECRS Rules fell well short of the public participation requirements set by the APA. *See* Appx.285-87 ¶¶ 46-49. Most notably, the ERCOT process does not

27

permit all interested members of the public to participate, as the APA requires. *Id.* Participation is limited to ERCOT Members and Market Participants at multiple stages, and the barriers to become an ERCOT Member or Market Participant, and therefore a part of the preferred commenting class, are significant.[9] Becoming a Market Participant requires significant investment and is limited to those with particular experience and expertise as a practical matter. *See* Appx.275-76 ¶ 21.[10] In practice, these requirements mean that the "public," and certainly interested parties beyond ERCOT Members and Market Participants, are excluded from participation.

---

[9] A Market Participant is:

> An Entity, other than ERCOT, that engages in any activity that is in whole or in part the subject of these Protocols, regardless of whether that Entity has signed an Agreement with ERCOT. Examples of such an Entity include but are not limited to the following:
> (a)      Load Serving Entity (LSE);
> (b)      Qualified Scheduling Entity (QSE);
> (c)      Transmission and/or Distribution Service Provider (TDSP);
> (d)      Congestion Revenue Right (CRR) Account Holder;
> (e)      Resource Entity;
> (f)      Independent Market Information System Registered Entity (IMRE); and
> (g)      Renewable Energy Credit (REC) Account Holder.

ERCOT Nodal Protocols § 2.1.

[10] Even for residential consumers, ERCOT Membership costs $100 per year. *See* ERCOT Market Notice, M-C100923-03 General, ERCOT Membership Application for 2024 Membership Year - FINAL REMINDER (Nov. 13, 2023), *available at* https://www.ercot.com/services/comm/mkt_notices/M-C100923-03.

## II. Procedural History

Aspire originally challenged certain PUC orders approving ECRS Rules in the Third District Court of Appeals. *See Aspire Power Ventures, L.P. v. PUC*, No. 03-24-00102-CV (Tex. App.—Austin). Consistent with then-existing case law from the Third Court, Aspire contended those orders were "competition rules" subject to such direct appeal under PURA § 39.001(e), (f). After Aspire filed that challenge, however, the Supreme Court of Texas decided *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024). In *RWE*, the Court reversed the authority Aspire relied on to file its direct appeal and held that PUC orders approving rules or protocols adopted by ERCOT were not "competition rules" subject to direct appeal under PURA § 39.001(e), (f). Aspire's direct-appeal challenge had been stayed by the Third District Court of Appeals pending the Supreme Court's disposition of *RWE*. After the Supreme Court issued its decision in *RWE*, the Fifteenth Court of Appeals—to which the case had been transferred—granted the PUC's motion to dismiss Aspire's direct appeal, which Aspire did not oppose. *Aspire Power Ventures, L.P. v. PUC*, No. 15-24-00035-CV, 2024 WL 4293602 (Tex. App.—15th Dist., Sept. 26, 2024, no pet.).

29

Meanwhile, Aspire had commenced an alternative challenge to the ECRS Rules, seeking a declaratory judgment of their invalidity in the District Court of Travis County under Texas Government Code § 2001.038(a)-(b). *Aspire Power Ventures, L.P. v. PUC, et al.*, Cause No. D-1-GN-24-003384 (345th District Court, Travis County, Texas); *see* Appx.12. Originally, Aspire named only the PUC and its Commissioners as defendants, *id.*, but later, after the issuance of the *RWE* decision, Aspire amended to add ERCOT, which had adopted the challenged rules under the rulemaking authority delegated to ERCOT by the PUC, Appx.43, 269.

In response, the PUC Parties (the PUC and its Commissioners) and ERCOT filed pleas to the jurisdiction, asserting sovereign immunity and failure to exhaust administrative remedies. Appx.74, 180, 304, 416. ERCOT also asserted, in the alternative, a motion to dismiss under Tex. R. Civ. P. 91a and a plea in abatement. Appx.74, 304, 325. The trial court set the pleas to the jurisdiction and ERCOT's Rule 91a motion for hearing. 2RR.1, 26-29. The parties briefed the jurisdictional and Rule 91a issues. Appx.304-502, 545-720. Aspire also filed an agreed motion for the trial court to take judicial notice of

various items from the PUC's and ERCOT's public records pertaining to the ECRS Rules in issue, Appx.505, which the trial court granted, Appx.725.

The jurisdictional hearing proceeded as scheduled. *See generally* 3RR.1-99. On October 21, 2024, the trial court issued two orders, granting the Amended Pleas to the Jurisdiction of both ERCOT and the PUC Parties and dismissing all of Aspire's claims, without articulating its reasons for doing so.[11] Appx.723, 726. The trial court's October 21 orders finally disposed of all claims against all parties; those orders therefore constituted final judgment. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). Aspire timely filed its notice of appeal to this Court on October 28, 2024. Appx.728.

## SUMMARY OF THE ARGUMENT

ERCOT and the PUC Parties filed pleas to the jurisdiction in the trial court, seeking dismissal of Aspire's claims on two grounds: (1) Aspire's claims were barred by sovereign or governmental immunity, and (2) Aspire did not exhaust its administrative remedies before

---

[11] Because of its jurisdictional ruling and dismissal of Aspire's claims, the trial court did not reach ERCOT's alternative Rule 91a motion to dismiss or plea in abatement. *See* Appx.723, 726.

31

bringing its claims to court. The trial court granted those pleas to the jurisdiction and dismissed without stating its reasons for doing so. Appx.723, 726. No matter. Neither ground supports dismissal of Aspire's claims.

Aspire's claims are not barred by sovereign or governmental immunity. Section 2001.038(a) of the Texas Government Code—part of the APA—expressly waives sovereign immunity for claims, like those asserted by Aspire, that challenge the validity of a state agency rule. *Tex. Dep't of State Health Services v. Balquinta*, 429 S.W.3d 726, 744 (Tex. App.—Austin 2014, pet. dism'd); *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 700 (Tex. App.—Austin 2011, no pet.).

ERCOT and the PUC contend the statutory waiver in § 2001.038(a) doesn't apply to Aspire's claims. The ECRS Rules, they argue, are not "state agency" "rules" within the meaning of the APA generally and § 2001.038 specifically because ERCOT is not a "state agency." But they are wrong. Courts have repeatedly applied the APA to rules promulgated by the PUC, which is a "state agency." *See, e.g., Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 263-67 (Tex. App.—Austin 2022, no pet.) (declaratory judgment that PUC rules were void for lack

of APA compliance). And ERCOT adopted the ECRS Rules solely on the basis of authority delegated to it by the PUC under PURA § 39.151(d). In so doing, ERCOT stepped into the shoes of its delegor, the PUC, subject to all the same requirements and restrictions that would have applied to the PUC itself, had it alone adopted the ECRS Rules.

But, ERCOT and the PUC Parties contend, the Texas Supreme Court in *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024), recently held that PUC orders approving rules adopted by ERCOT are not "rules" under the APA. *RWE*, however, was a much narrower decision than Appellees portray it to be. The sole issue before the Court was the jurisdiction of the court of appeals to entertain a direct appeal of a "competition rule" under PURA § 39.001(e), a statute and procedure not involved in this case. And in resolving that narrow question, *RWE* dealt only with PUC "approval" orders in isolation; ERCOT was not a party and its role in the "adoption" of rules was not before the Supreme Court. Perhaps most important, Government Code § 2001.038 was not at issue in *RWE* and was not even mentioned. *RWE* does not support ERCOT's and the PUC's attempt to evade review.

Section 2001.038(d) also explicitly negates any putative requirement that a plaintiff like Aspire must first exhaust administrative remedies before challenging the validity of an agency rule in court, such as that mounted here by Aspire. *See, e.g.*, *Tex. Tel. Ass'n*, 653 S.W.3d at 264 n.17 ("there is no requirement to exhaust administrative remedies before bringing a Section 2001.038(a) challenge").

Finally, Aspire alleges that the PUC Commissioners acted contrary to PURA in authorizing or allowing ERCOT to adopt the ECRS Rules—i.e., it alleges they acted *ultra vires*. And sovereign or governmental immunity does not arise with respect to *ultra vires* claims. *Herrera v. Mata*, No. 23-0457, 2024 WL 4996713, at *2 (Tex. Dec. 6, 2024) (per curiam); *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016).

Aspire, therefore, is entitled to reversal of the trial court's orders granting Appellees' jurisdictional pleas and dismissing Aspire's claims.

## STANDARD OF REVIEW

This is an appeal from the trial court's orders granting pleas to the jurisdiction and dismissing Aspire's claims on that basis. Appx.723,

726, 728. "As subject-matter jurisdiction is a question of law, [courts] review a trial court's ruling on a plea to the jurisdiction de novo." *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 749 (Tex. 2020) (citing *Hous. Belt & Terminal*, 487 S.W.3d at 160); *PUC v. AMA Commc'ns, LLC*, No. 03-21-00597-CV, 2022 WL 3220405, at *3 (Tex. App.—Austin Aug. 10, 2022, no pet.).

ERCOT's and the PUC's Amended Pleas to the Jurisdiction rested on claims of sovereign immunity and Aspire's alleged failure to exhaust administrative remedies. Appx.306-07, 314-25; Appx.417-19, 422-33. But sovereign or governmental immunity does not bar claims of *ultra vires* conduct, such as those alleged by Aspire. *See Herrera v. Mata*, No. 23-0457, 2024 WL 4996715, at *2 (Tex. Dec. 6, 2024) (per curiam). And the Legislature expressly waived immunity for challenges to the validity of agency rules, like those at issue here, in Texas Government Code § 2001.038.

> In determining whether the State has waived sovereign immunity, [courts] apply traditional principles of statutory interpretation. … When [courts] interpret a statute, [their] purpose is to give effect to the Legislature's intent by looking at its plain and ordinary meaning, 'and then consider the term's usage in other statutes, court decisions, and similar authorities.' … [Courts] turn to extrinsic sources only if the

35

statute is ambiguous or if applying the statute's plain meaning would produce an absurd result.

*EBS Sols.*, 601 S.W.3d at 749 (citations omitted).

Although all parties referred to items beyond the pleadings in their briefing below, Defendants–Appellees explicitly stated that their "plea[s] to the jurisdiction challenge[] the pleadings" of Plaintiff–Appellant Aspire "as a matter of law." Appx.317; Appx.417. "When a plea to the jurisdiction challenges the pleadings"—as Appellees ERCOT and the PUC Parties did here—courts "determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. … [Courts] construe the pleadings liberally in favor of the plaintiffs and look to the pleader's intent." *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex. 2004); *PUC v. AMA Commc'ns*, 2022 WL 3220405, at *3 ("we construe the pleadings liberally in the plaintiff's favor, taking factual assertions as true").[12] In fact, the Supreme Court has said a court should "grant a jurisdictional plea challenging the pleadings only if the pleadings 'affirmatively

---

[12] "If a plea to the jurisdiction challenges the existence of jurisdictional facts, [reviewing courts] consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Miranda*, 133 S.W.3d at 227 (citing *Bland ISD v. Blue*, 34 S.W.3d 547, 555 (Tex.2000)). The trial court here made no findings of fact in granting Appellees' Amended Pleas to the Jurisdiction. *See* Appx.723, 726.

36

negate' jurisdiction." *Herrera*, 2024 WL 4996715, at *2 (quoting *Hous. Belt & Terminal*, 487 S.W.3d at 160).

## ARGUMENT

ERCOT and the PUC Parties argued that the trial court lacked jurisdiction (1) because of sovereign or governmental immunity and (2) because Aspire did not exhaust its administrative remedies by timely challenging the NPRRs through the PUC itself. *See* Appx.306-07, 314-25; Appx.417-19, 422-33. But Texas Government Code § 2001.038 both (1) waives sovereign or governmental immunity for claims like Aspire's that challenge "the validity … of a rule," and (2) eliminates any requirement for a plaintiff to exhaust administrative remedies for declaratory judgment challenges to agency rules. Tex. Gov't Code § 2001.038(a), (c), (d).

Whether § 2001.038 waives sovereign immunity here and also negates any requirement to exhaust administrative remedies boils down to whether the NPRR that created ECRS and the subsequent NPRRs that modified it are "rules" within the meaning of the APA, Tex. Gov't Code § 2001.003(6). They are. The PUC is a state agency, *see id.* § 2001.003(7), and when it delegates its rulemaking authority to

37

ERCOT, ERCOT too must be treated as a state agency in making rules through that delegated authority. *RWE* itself confirms that the NPRRs are the product of the PUC's rulemaking authority "delegated to [ERCOT] by the PUC, as authorized by PURA." *RWE*, 691 S.W.3d at 486. In addition, Aspire alleged that the adoption and modification of ECRS was *ultra vires*—beyond the statutory authority of the PUC Commissioners to accomplish, or to delegate to ERCOT and allow—and as a matter of law *ultra vires* claims are not barred by sovereign or governmental immunity. *Herrera*, 2024 WL 4996715, at *2. The trial court's dismissal of Aspire's case for want of jurisdiction, therefore, must be reversed.

I.   **Government Code § 2001.038 waives sovereign or governmental immunity for challenges to the validity of a "rule," as defined by the APA.**

Both ERCOT and the PUC Parties argued that the doctrine of sovereign or governmental immunity bars the trial court's jurisdiction over Aspire's challenge to the ECRS Rules. Appx.306, 318 (citing *CPS Energy v. ERCOT*, 671 S.W.3d 605, 628 (Tex. 2023)); Appx.417-18 (citing *Tex. Nat. Res. Conserv. Comm'n v. IT-Davy*, 74 S.W.3d 849, 853

(Tex. 2002)). Both acknowledged, however, that sovereign immunity is no bar if the Legislature has waived it by statute. Appx.318, 417-18.

Government Code § 2001.038 embodies just such a waiver. It says, "The validity or applicability of a rule … may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff," and it requires that "[t]he state agency must be made a party to the action." Tex. Gov't Code § 2001.038(a) & (c). This language in § 2001.038 expressly waives sovereign immunity for claims falling within its scope. *Tex. Dep't of State Health Services v. Balquinta*, 429 S.W.3d 726, 744 (Tex. App.—Austin 2014, pet. dism'd); *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 700 (Tex. App.—Austin 2011, no pet.).

But, relying on the Texas Supreme Court's recent decision in *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024), ERCOT and the PUC Parties have argued that § 2001.038's waiver of sovereign immunity doesn't apply here because "neither ERCOT's [ECRS] Protocols, nor the PUCT's orders approving the adoption of or revisions to those Protocols, are 'rules' under the APA" generally, and

§ 2001.038 specifically. Appx.319; *see* Appx.422-24. That argument, however, mischaracterizes the process by which ERCOT and the PUC promulgated the ECRS Rules and reads the Supreme Court's opinion in *RWE* too expansively. *See* Appx.273-74 ¶¶ 15-16. Simply put, it is just not right.

### A. Challenges to rules adopted by the PUC itself fall within § 2001.038.

"Rules" adopted by the PUC are subject to the APA, including § 2001.038. PUC rules have been found subject to and declared invalid pursuant to § 2001.038 on multiple occasions. *See, e.g.*, *Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 263-67 (Tex. App.—Austin 2022, no pet.) (declaratory judgment that PUC rules were void for lack of APA compliance); *see also PUC v. AMA Commc'ns, LLC*, No. 03-21-00597-CV, 2022 WL 3220405, at *4 (Tex. App.—Austin Aug. 10, 2022, no pet.) (PUC decision constituted "rule for purposes of the APA, triggering procedural and substantive requirements with which the PUC did not comply"); *Sw. Bell Tel. Co. v. PUC*, 888 S.W.2d 921, 929 (Tex. App.—Austin 1994, writ denied) (declaring PUC rules partially invalid under § 2001.038).

The APA defines a "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency," including "the amendment or repeal of a prior rule." Tex. Gov't Code § 2001.003(6). The PUC is a "state agency." Tex. Gov't Code § 2001.003(7); *see Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 265 (Tex. App.—Austin 2022, no pet.) ("The PUC Parties do not dispute that the Contract Amendment is a 'state agency statement.'"); *City Pub. Serv. Bd. of San Antonio v. PUC*, 9 S.W.3d 868, 876 (Tex. App.—Austin 2000), *aff'd*, 53 S.W.3d 310 (Tex. 2001) (addressing "a state agency, the PUC"). And the ECRS Rules are "statements of general applicability" that implement law or policy and describe the procedure for doing so. *See* Appx.310, 312-14. The very statute the PUC relies on for the authority to promulgate the ECRS protocols expressly says they are "rules." *See* Tex. Util. Code § 39.151(d) ("[t]he commission [PUC] shall adopt and enforce *rules* relating to the reliability of the regional electrical network" (emphasis added)).

So, if the PUC, acting alone, had formulated and adopted the ECRS Rules, their substance and the process of their adoption would be

41

subject to the requirements of the APA and to challenge under § 2001.038. And it is ***the PUC's own unquestioned status as a "state agency,"*** together with the fact that the products of its rulemaking are "rules" within the meaning of §§ 2001.003(6) and 2001.038, that is fatal to ERCOT's and the PUC's sovereign immunity arguments.

### B. The PUC delegated its authority to formulate and adopt certain rules to ERCOT—providing the only authority ERCOT had to adopt such rules.

PURA § 39.151(d) directed the PUC to "adopt and enforce ***rules*** relating to the reliability of the regional electrical network." (Emphasis added.) But that statute goes on to provide that the PUC "may delegate those responsibilities to an independent organization …. certified by the commission [that] is directly responsible and accountable to the commission." *Id.* And so, instead of adopting the ECRS Rules entirely on its own, the PUC purportedly "delegated" to ERCOT the authority to adopt those rules pursuant to PURA § 39.151(d). *See* 16 Tex. Admin. Code § 25.362(c); *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484, 486 (Tex. 2024).

Originally, this delegation of authority allowed ERCOT to promulgate and adopt rules with immediate effect (subject to PUC's

overarching authority, *see* Tex. Util. Code § 39.151(d)). In 2021, however, the Legislature amended PURA to provide that "Protocols adopted by an independent organization … under delegated authority from the commission … may not take effect before receiving commission approval." Tex. Util. Code § 39.151(g-6); *see* Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15; *see also* Tex. Util. Code § 39.151(g-6) ("a reference to a protocol includes a rule").

Exercising the authority purportedly delegated to it by the PUC, ERCOT adopted the protocol creating ECRS in 2019, before the Legislature required PUC approval for such rules to take effect. NPRR 863, Creation of ERCOT Contingency Reserve Service and Revisions to Responsive Reserve (Feb. 12, 2019).[13] Most of the other ECRS Rules amending or revising that original protocol or rule were promulgated after PURA was amended in 2021 to require a joint process of ERCOT adoption and PUC approval for the protocol or rule to take effect. *See* Appx.278-79 ¶ 29 (listing ECRS Rules in issue).

---

[13] The PUC had no authority to delegate rulemaking power to ERCOT for the original creation of an "ancillary service." *See* Part III, below.

43

But the PUC's delegation of its rulemaking authority to ERCOT changed nothing about the applicability of the APA generally, and § 2001.038 specifically, to the ECRS Rules or the process of their promulgation under that PUC-delegated authority—including § 2001.038's waiver of sovereign immunity. By statute, in exercising that delegated rulemaking authority, ERCOT was and "is directly responsible and accountable to the commission [the PUC, which] has complete authority to oversee [ERCOT's] operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties." Tex. Util. Code § 39.151(d). So, it is the *PUC*'s nature and authority that determine the applicability of the APA and § 2001.038.

C. **When ERCOT adopted NPRRs under rulemaking authority delegated by the PUC, it acted as and stood in the shoes of the PUC and was subject to the same requirements and limitations as the PUC—including the APA generally and § 2001.038 specifically.**

In the trial court, ERCOT argued that its "adoption and revision of [ECRS] Protocols …does not constitute APA rulemaking" subject to the APA and § 2001.038 because "ERCOT is not a 'state agency'" as defined in the APA. Appx.319-20; *see* Tex. Gov't Code § 2001.003(6)

(defining "rule" for APA purposes as "a *state agency* statement of general applicability" that "implements, interprets, or prescribes law or policy" (emphasis added)); Tex. Gov't Code § 2001.03(7) ("'State agency' means a state officer, board, commission, or department with statewide jurisdiction that makes rules or determines contested cases."). It is true that, while ERCOT has been recognized as an "organ of [state] government," it is a "private, nonprofit corporation," albeit one certified by the PUC to perform certain state functions. *CPS Energy v. ERCOT*, 671 S.W.3d 605, 617 (Tex. 2023). But ERCOT goes astray by focusing on whether it, in its own right, is a "state agency."[14]  The applicability of the APA is determined by the status and nature of the entity that delegated to ERCOT the authority to adopt the ECRS Rules, i.e, the PUC, which undeniably is a "state agency" under the APA.

When, as here, ERCOT (or any other entity) exercises authority delegated to it by a "state agency" like the PUC, its conduct in doing so

---

[14] ERCOT did not contest the fact that its ECRS Rules are "statements of general applicability" that "implement … law or policy" under Tex. Gov't Code § 2001.003(6). To the contrary, ERCOT confirmed that it is the "'essential organization' statutorily charged with operating **the State's electric grid and wholesale electricity markets**—all while subject to the PUCT's 'complete authority.' … ERCOT is the entity that Texas tasked with regulating Texas's intrastate grid and wholesale electricity markets, subject to plenary control by the PUCT." Appx.309 (emphasis added).

45

is subject to the same constraints and requirements as those applicable to the delegating agency. The delegee, ERCOT here, necessarily is treated as that delegating agency would be, not in its own right as a private corporation (with no authority to undertake the conduct at issue). It "stands in the shoes" of the delegating entity, and "the power being exercised is the same as that exercised by the" delegating entity. *See, e.g., City of Garland v. Byrd*, 97 S.W.3d 601, 606 (Tex. App.—Dallas 2002, pet. denied).

The Supreme Court of Texas made this clear in *Lindsay v. Sterling*, 690 S.W.2d 560 (Tex. 1985). There, it held that when a statewide agency delegated decisions to a person or entity that was *not*, itself, a "state agency" having "statewide jurisdiction," the actions of that person or entity were nevertheless subject to the Administrative Procedure and Texas Register Act, the forerunner of the current APA:

> The major issue to be decided is whether in reviewing an application for a wine and beer license the provisions of the Administrative Procedure and Texas Register Act (APTRA) are applicable to the proceedings before the county judge and to the judicial review of the county judge's denial of the application. … Although section 3 of APTRA defines "agency" as any state board, commission, department, or officer having statewide jurisdiction, the county judge is actually acting as part of the review process of the Texas Alcoholic Beverage Commission, a statewide agency. …

46

> Because the county judge's decision constitutes a denial of a license issued under the Texas Alcoholic Beverage Commission, the hearing of the county judge and the judicial review of that hearing are subject to the provisions of APTRA.

*Id.* at 561-62. In other words, the actions of a delegee—like the county judge in *Lindsay* or ERCOT here—are treated as the actions of the delegor state agency. The Supreme Court's holding in *Lindsay v. Sterling* applies with full force to the current APA and to the circumstances here.[15] It controls the key jurisdictional issue in this case.

And *Lindsay* is not an outlier. Multiple courts in other jurisdictions have reached the same conclusion as the Texas Supreme Court in *Lindsay*, analyzing other states' counterparts to the Texas APA. For example, the Supreme Court of Ohio was called upon to decide whether the Ohio State University Board of Trustees' adoption of rules governing members of that state's "classified civil service" were subject to Ohio's administrative procedure act. *Bd. of Trustees of Ohio State Univ. v. Dept of Admin. Svcs.*, 429 N.E.2d 428 (Ohio 1981). There, as in

---

[15] Pertinent provisions of APTRA, including the definition of "state agency," were "codified without substantive changes in 1993" as the APA. *Mednick v. Tex. State Bd. Pub. Accountancy*, 933 S.W.2d 336, 337 n.1 (Tex. App.—Austin 1996, writ denied); *see Tex. Dep't of Protective & Regulatory Services v. Mega Child Care, Inc.*, 145 S.W.3d 170, 172 (Tex. 2004).

47

Texas, the act "applies only to bodies fitting the [statutory] definition of 'agency.'" *Id*. at 430. The court recognized that the "university is not an 'agency' within the meaning of" Ohio's administrative procedure act. *Id*. But the university adopted the rules in question under authority delegated to it from Ohio's Department of Administrative Services, which ***is*** an "agency" as defined in Ohio's administrative procedure act. *Id*. at 431. The Ohio Supreme Court therefore held that, "[w]here, as here, the university acts as an appendage of an agency within the definition of [the administrative procedure act], ***it must comply with the duties imposed on that agency just as the agency would be bound***." *Id*. at 430 (emphasis added).

Multiple California courts have reached the same result. For example, the court in *Garner v. City of Riverside* had to decide whether a city's personnel decisions were subject to that state's administrative procedure act. 170 Cal. App. 3d 510, 216 Cal. Rptr. 486 (Ct. App. 1985). It held that, even though the city is not an "agency" in its own right, the "petitioner [was] incorrect in asserting the decision of the city here was made in its capacity as a local agency." 170 Cal. App. 3d at 516. Instead, the court held, the city "act[ed] as a delegate" of a statewide agency and

therefore was "subject to the Administrative Procedures Act for that purpose just as is the [delegating statewide agency] itself when it makes the same determination." *Id. Accord, e.g.*, *Usher v. Cnty. of Monterey*, 65 Cal. App. 4th 210, 216, 76 Cal. Rptr. 2d 274, 278 (1998), *as modified* (June 23, 1998); *Watkins v. City of Santa Ana*, 189 Cal. App. 3d 393, 397, 234 Cal. Rptr. 406, 408 (Ct. App. 1987).

Further, Texas courts have recognized, as a general legal principle, that delegees must be held to the same constraints and obligations as their delegors. *See, e.g.*, *Byrd*, 97 S.W.3d at 606 (when private hearing examiner conducts hearing in lieu of commission, "the examiner is granted the same duties and powers as the commission [and] stands in the shoes of the commission"); *Mainland Sav. Ass'n v. Hoffbrau Steakhouse, Inc.*, 659 S.W.2d 101, 102 (Tex. App.—Houston [14th Dist.] 1983, no writ) ("assignee/delegatee … stands in [delegor's] place with respect to any benefits or obligations under the original agreement"); *cf. DuPuy v. City of Waco*, 396 S.W.2d 103, 108 (Tex. 1965) ("In the exercise of the power to take or appropriate private property for public use, [entities] to which the power of eminent domain has been

delegated, are in the same position and are governed by the same rule" as the state.).

All these holdings reflect the fundamental principle that a delegor like the PUC here can delegate only the authority it has, subject to all the same constraints to which it is subject. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "delegate," in part, to mean "[t]o give part of one's power or work to someone"). Because the PUC is and would be subject to and constrained by the APA (including § 2001.038) in exercising rulemaking authority under PURA—e.g., if the PUC alone had adopted the ECRS Rules—it could not delegate to ERCOT the authority to exercise that power shorn of those same limitations and requirements.[16] In other words, the PUC could not delegate to ERCOT authority greater than the PUC itself possessed. Like the PUC,

---

[16] The Supreme Court of Texas in *RWE* relied heavily on "the Legislature's deliberate decision not to designate the PUC as the entity that 'adopts' ERCOT protocols," and its "distinct use of 'adopt' and 'approve'" with respect to the promulgation of ERCOT protocols under PURA § 39.151. *RWE*, 691 S.W.3d at 491, 492. Following suit, this Court "cannot ignore the Legislature's deliberate decision," *id.*, to authorize the PUC to "***delegate***" *its own* rulemaking authority to an independent organization like ERCOT. Tex. Util. Code § 39.151(d). The Legislature could have granted that authority directly to the independent organization. But it didn't. And by providing that ERCOT would obtain such authority only by *delegation*, the Legislature effectively guaranteed that it would be subject to the same requirements and limitations as it would have been if exercised by the delegor, the PUC.

therefore, ERCOT was subject to the APA when it adopted rules based on authority delegated to it by the PUC.

### D. *RWE* does not undermine Aspire's reliance on § 2001.038 as a waiver of sovereign immunity with respect to its challenge to the ECRS Rules.

In the trial court, both ERCOT and the PUC Parties contended that, even though (1) the ECRS Rules would have been subject to the APA and to challenge under § 2001.038 if adopted by the PUC itself, and (2) ERCOT "adopted" the ECRS Rules acting for, and solely by authority delegated to it by, the PUC, Aspire's jurisdictional arguments nevertheless are foreclosed by the Texas Supreme Court's recent decision in *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024). But *RWE* says no such thing.

The only issue before the Supreme Court in *RWE* was whether the Third Court of Appeals had original jurisdiction under PURA § 39.001(e)-(f) of a direct appeal from a PUC order "approving" a rule "adopted" by ERCOT. *RWE*, 691 S.W.3d at 485, 486, 488-89, 492. That jurisdictional question turned on whether the PUC's approval order was a "competition rule" under § 39.001(e). *Id.* at 485-86. The PUC was the only respondent; ERCOT was not a party. *Id.* at 485. The only order at

issue was the PUC approval order, not the underlying ERCOT rule. *Id.* at 485, 486, 488-89, 492.

The Supreme Court held that the approval order issued by the PUC was not itself a "competition rule," or a "rule" of any sort under APA § 2001.03(6). *Id.* at 492. And so, it dismissed the case for want of jurisdiction, nothing more. *Id.* The Supreme Court in *RWE* did not address the bases for jurisdiction upon which Aspire relies in this case—APA § 2001.038 and *ultra vires* actions of the PUC Commissioners—which were not at issue in *RWE*.

In the trial court, ERCOT went so far as to say that "*RWE **held** …* that neither ERCOT's Protocols, nor the PUCT's orders approving the adoption of or revisions to those Protocols, are 'rules' under the APA," which would include § 2001.038. Appx.319 (citing *RWE*, 691 S.W.3d at 492 (emphasis added)). That was false. ERCOT was not even a party to *RWE* and the Court's holding did not assess ERCOT's adoption of or revisions to its protocols. They were not at issue in that appeal. Instead, the Court in *RWE* was clear in its holding about the narrow jurisdictional issue it decided:

> We hold that the PUC's **approval order** is not a
> "competition rule[] adopted by the commission" subject to the

52

> judicial-review process for PUC [competition] rules. … [T]he statutory requirement the PUC approve [ERCOT] adopted protocols does not transform PUC ***approval orders*** into PUC rules ***eligible for direct review by a court of appeals*** [under Tex. Util. Code § 39.001(e)].

*RWE*, 691 S.W.3d at 486 (emphasis added; italics original); *see also id.* at 492 ("we hold that the ***PUC's order approving*** NPRR 1081 … was not an agency-adopted 'rule' under the Administrative Procedure Act," so that "***the court [of appeals] lacked jurisdiction*** over RWE's challenge to the ***PUC's approval order***" (emphasis added)). The Supreme Court's holding resulted from a painstaking linguistic analysis of the difference between "adoption" (as used in the APA definition of an agency "rule" and in PURA § 39.001(e)) and a PUC order "approving" an ERCOT-adopted rule (as Tex. Util. Code § 39.151(g-6) now requires for such a rule to take effect)—a distinction not at issue here. *See RWE*, 691 S.W.3d at 491-92. *RWE*, therefore, does not undermine Aspire's contention that § 2001.038 waives sovereign immunity for its district-court challenge to the validity of the ECRS Rules adopted by ERCOT as the PUC's delegee.

While ERCOT overstated the scope of *RWE*, the PUC Parties mischaracterized and improperly circumscribed Aspire's challenge in an

attempt to shoehorn it into the narrow holding of *RWE*. Multiple times, the PUC Parties argued that Aspire's claims should be dismissed because the Supreme Court concluded in *RWE* that "PUCT approval orders are not agency rules." *See, e.g.*, Appx.422, 423, 424. But that is an artificially constricted view of Aspire's claims. Aspire does not challenge the "PUCT approval orders" in isolation, as did the petitioner in *RWE*. Instead, Aspire challenges the ***combined*** actions of ERCOT and the PUC in promulgating the ECRS Rules.

After the Legislature amended PURA § 39.151(g-6) in 2021 to require PUC approval of ERCOT-adopted rules or protocols, the promulgation of rules "adopted" by ERCOT and "approved" by the PUC necessarily must be evaluated as a combined, integrated process—not broken down into its component parts, as the PUC has suggested. "ERCOT and the PUC are uniquely situated as legislatively endorsed ***joint participants*** in a complex regulatory scheme." *RWE*, 691 S.W.3d at 490 (emphasis added). After the 2021 amendments, no ERCOT-adopted protocol can become effective without PUC approval; and, obviously, the PUC cannot "approve" an ERCOT protocol unless it is first created and "adopted" by ERCOT. Viewed properly as products of

54

an integrated process, therefore, the ECRS protocols are "agency rules" subject to challenge under § 2001.038 and its waiver of sovereign immunity, and to the APA as a whole.[17] *Cf. Tex. Tel. Ass'n v. PUC*, 653 S.W.3d at 263-67 (ruling that PUC actions it characterized as "guidelines" were in fact and in substance agency "rules" subject to the requirements of the APA).

### E. PURA's directive that ERCOT be required to establish a "formal process" for its PUC-delegated rulemaking authority does not supplant the APA.

In its 2021 amendments to PURA, the Legislature directed that independent organizations "certified" by the PUC, like ERCOT, had to "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Tex. Util. Code § 39.151(g-6). In the trial court, ERCOT argued that statutorily required "formal process" was meant to take the place of the APA, making it inapplicable to ERCOT proceedings. *See* Appx.320-21. But PURA § 39.151(g-6) doesn't say that, and it is unreasonable to assume that's what the Legislature intended.

---

[17] ECRS Rules adopted by ERCOT before the statute was amended to require PUC approval for them to take effect would, of course, be evaluated under the APA simply at the ERCOT level, where it acted through authority delegated to it by the PUC. But, as explained above, the "state agency" status of the delegor, the PUC, controls and renders those earlier protocols "rules" under and subject to the APA.

55

The APA declares at its outset that, "It is ***the public policy of the state*** through this chapter to: (1) provide ***minimum standards*** of uniform practice and procedure for state agencies; [and] (2) provide for public participation in the rulemaking process." Tex. Gov't Code § 2001.001 (emphasis added). Section 2001.001 "is a plain statement of the APA's general applicability to all state agencies and the processes for judicial review of their decisions. The APA's provisions to that effect, which are myriad and voluminous, would be wasted ink if they did not generally apply to all state agencies." *Mosley v. Tex. Health & Human Services Comm'n*, 593 S.W.3d 250, 258 (Tex. 2019). The Legislature's amorphous 2021 directive in Texas Utilities Code § 39.151(g-6) that certified independent organizations like ERCOT must put in place some wholly undefined "formal process" for adopting rules cannot be read to supplant the "public policy of the state" "to provide ***minimum standards*** of uniform practice and procedure" embodied in the APA.

First, as noted, nothing in the statutory language states or even suggests that the "formal process" to be adopted by ERCOT would not have to incorporate the requirements of the APA, tailored to ERCOT's specific situation. And that is fatal to ERCOT's position.

Texas Utilities Code § 39.151(g-6) itself does not expressly incorporate the APA or make it applicable to ERCOT proceedings. But that doesn't matter. "Absent an express statutory provision indicating that the APA is inapplicable …, [courts] have no basis for concluding that the APA does not apply …. '[I]t matters not that the [agency's] enabling statute does not expressly incorporate the APA'; what matters is that 'the enabling statute does not contradict the APA.'" *Gonzalez v. Tex. Med. Bd.*, No. 03-22-00205-CV, 2023 WL 7134982, at *7 (Tex. App.—Austin Oct. 31, 2023, pet. filed) (quoting *Heat Energy Advanced Tech., Inc. v. West Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 291 n.1 (Tex. App.—Austin 1998, pet. denied)).

PURA § 39.151(g-6) does not exempt ERCOT's processes from the APA or state that the APA will not apply. The two statutes are not mutually exclusive. And the Legislature certainly knew how to make clear, expressly, when it did not want the APA to apply to any given administrative process.[18] The APA itself contains an explicit list of

---

[18] *See, e.g.*, Tex. Gov't Code § 411.180(a) (hearing on any denial, revocation, or suspension of handgun license "is not subject to Chapter 2001 (Administrative Procedure Act)"); Tex. Hum. Res. Code § 40.063 ("Section 2001.038 and Subchapters C through H, Chapter 2001, Government Code do not apply" to described categories of medical benefit decisions); Tex. Parks & Wild. Code § 32.006 (provision entitled

57

administrative proceedings to which it does not apply. Tex. Gov't Code §§ 2001.221, 2001.227. That list of exemptions does not include ERCOT/PUC rulemaking. *Id.*[19]

And interpreting the APA to apply here is important for practical reasons, because the procedures employed by the PUC and ERCOT in adopting the ECRS Rules fell far short of the "minimum standards" of the APA, decreed to be the "public policy" of the State—standards that are not difficult to meet. For example, neither the PUC nor ERCOT posted any notice of proposed rulemaking for any of the ECRS Rules in the Texas Register, much less a notice that met the timing and content requirements of the APA. *See* Tex. Gov't Code §§ 2001.023, 2001.024. Nor did either post a notice of adoption in the Texas Register with all of the information required by the APA, including a reasoned justification for the rule. *See* Tex. Gov't Code § 2001.033. Further, the ERCOT process does not and did not allow for participation of all interested

---

"Nonapplicability of Chapter 2001, Government Code" states "provisions of the Administrative Procedure Act … do not apply to this chapter").

[19] Again, ERCOT has argued the APA and its statements of public policy are inapposite because it is not a "state agency." But, as explained in Part I.C, above, ERCOT could adopt the ECRS Rules only by exercising authority delegated to it by the PUC. When exercising that delegated authority, then, ERCOT acts for and is subject to the same constraints as the PUC, which *is* a state agency.

persons, a core requirement and purpose of the APA. Appx.285-87 ¶¶ 46-49.

Given the numerous court decisions holding that the PUC is subject to the APA in rulemaking, and the absence of an express statement by the Legislature in § 39.151(g-6) that the "minimum standards" of the APA were to be supplanted by an unspecified "formal process" to be crafted by an entity like ERCOT, the rulemaking activities of ERCOT and its supervising agency, the PUC, cannot escape application of the APA.

## II. Aspire was not required to "exhaust administrative remedies" before pursuing its challenge in the district court.

In the trial court, both ERCOT and the PUC Parties devoted considerable attention to detailed descriptions of the internal administrative processes within ERCOT and the PUC by which Aspire allegedly might have challenged the ECRS protocols. *See* Appx.310-12, 314-17, 322-25, 424-28. They then argued that Aspire's challenge in the trial court was barred because Aspire did not first pursue and exhaust those administrative remedies. *See* Appx.322-25, 424-28. But that is not correct.

Government Code § 2001.038(d) provides that, "A court may render a declaratory judgment [regarding the validity or invalidity of a rule] without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question." Courts have rightly interpreted that provision to mean that "***there is no requirement to exhaust administrative remedies before bringing a Section 2001.038(a) challenge***," such as that mounted here by Aspire. *Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 264 n.17 (Tex. App.—Austin 2022, no pet.) (emphasis added); *accord, e.g., PUC. v. AMA Commc'ns, LLC*, No. 03-21-00597-CV, 2022 WL 3220405, at *4 (Tex. App.—Austin Aug. 10, 2022, no pet.).

**III. In addition, and in the alternative, sovereign immunity does not bar Aspire's *ultra vires* claims against the PUC Commissioners.**

Apart from the statutory waiver of sovereign immunity in APA § 2001.038, sovereign immunity does not arise at all with respect to Aspire's claims that the PUC Commissioners acted *ultra vires* in connection with the promulgation of the ECRS Rules. "[W]hile governmental immunity provides broad protection to the state and its officers, it does not bar a suit against a government officer for acting

60

outside his authority—i.e., an *ultra vires* suit." *Houston Belt &*

*Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016);

*accord Hartzell v. S.O.*, 672 S.W.3d 304, 311 (Tex. 2023) (citing *City of*

*El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)).

"To maintain an ultra vires suit, the claimant must 'allege, and

ultimately prove, that [a governmental official] acted without legal

authority or failed to perform a purely ministerial act.'" *Hartzell*, 672

S.W.3d at 311 (quoting *Heinrich*, 284 S.W.3d at 372). Analysis focuses

on the allegations in the pleadings, and "[w]hether a claimant has

alleged a valid ultra vires claim is a question of law that [appellate

courts] review de novo." *Id*. "When making this determination, [courts]

construe the pleadings liberally in the plaintiff's favor, taking factual

assertions as true and looking to the plaintiff's intent." *PUC v. AMA*

*Commc'ns, LLC*, No. 03-21-00597-CV, 2022 WL 3220405, at *3 (Tex.

App.—Austin Aug. 10, 2022, no pet.); *accord, e.g., Tex. Dep't of State*

*Health Services v. Sky Mktg. Corp.*, No. 03-21-00571-CV, 2023 WL

6299115, at *11 (Tex. App.—Austin Sept. 28, 2023, pet. filed) ("At this

stage of the case, our inquiry concerns the trial court's jurisdiction and

not the merits of the parties' disputes[, c]onstruing the pleadings

61

liberally in favor of" the plaintiff.). More pointedly, a Texas court will "grant a jurisdictional plea challenging the pleadings only if the pleadings 'affirmatively negate' jurisdiction." *Herrera v. Mata*, No. 23-0457, 2024 WL 4996713, at *2 (Tex. Dec. 6, 2024) (per curiam) (quoting *Hous. Belt & Terminal*, 487 S.W.3d at 160).

Aspire's pleadings do not "affirmatively negate jurisdiction." Instead, Aspire alleged two ways in which the PUC Commissioners acted beyond or contrary to their statutory authority—i.e., *ultra vires*. *See* 1RR.30-31; Appx.290 ¶ 59.[20]

*First*, Aspire alleged that the ECRS Rules violate one of the primary directives of PURA. The ECRS Rules provide for ERCOT to pay generators of electrical power to withhold part of their generating capacity as reserves, conduct that is barred under PURA. *See* Appx.279-80 ¶ 30. PURA § 39.157(a) charges the PUC with preventing market power abuses and expressly defines "withholding of production" as a market-power abuse. *See also* 16 Tex. Admin. Code §§ 25.501(j),

---

[20] In addition to forming the basis for independent *ultra vires* claims against the PUC Commissioners, each instance in which the ECRS Rules or the procedures for their adoption violated PURA or exceeded the statutory authority of the PUC or ERCOT constitutes an additional ground for the invalidity of those Rules under Tex. Gov't Code § 2001.038. *See Sw. Bell Tel. Co. v. PUC*, 888 S.W.2d 921, 923 (Tex. App.—Austin 1994, writ denied).

25.503(a)(6), (d). Predictably, and contrary to the directive of PURA § 39.157(a), ECRS has caused artificial electricity shortages that produced massively inflated costs for electricity sold on the Texas wholesale market. *See* Appx.288 ¶ 53. The PUC Commissioners acted beyond or contrary to their statutory authority when they purported to authorize ERCOT to adopt and implement that market-power abuse through ECRS, or by failing to exercise the PUC's "complete authority" over ERCOT to prevent it from doing so. *See* Appx.279-80, 290 ¶¶ 30, 59(a).

*Second*, the PUC Commissioners acted beyond or contrary to their statutory mandate when they allowed or purported to authorize ERCOT to adopt, in the first instance, a new "ancillary service" in the form of ECRS. PURA § 35.004(e) provides that, "'ancillary services' means services necessary to facilitate the *transmission* of electric energy" and directs that these are "services … ***the commission*** may determine by rule." Tex. Util. Code § 35.004(e) (emphasis added). The PUC Parties concede ECRS is an "ancillary service." *See* Appx.420. The ECRS ancillary service was not "determined" or established by the Commission, however, as prescribed in § 35.004(e). Instead, ECRS was

created by ERCOT. But ERCOT had no authority to create that new ancillary service. Nor did the PUC have statutory authority to delegate that power to ERCOT.[21] The Commission's ability to delegate rulemaking authority to ERCOT is limited by PURA to issues of reliability and accounting. Tex. Util. Code § 39.151(d) ("The commission shall adopt and enforce rules ***relating to the reliability*** of the regional electrical network and ***accounting*** for the production and delivery of electricity … or may delegate those responsibilities to an independent organization." (emphasis added)). The power of delegation granted to the PUC by § 39.151(d) does not include delegating the creation of ancillary services that, by definition, relate to "the *transmission* of electric energy," rather than reliability or accounting concerns. *See* Tex. Util. Code § 35.004(e) (emphasis added).[22]

---

[21] The Legislature did direct the PUC to "require … ERCOT …  to develop and implement an ancillary services program to procure dispatchable reliability reserve services on a day-ahead and real-time basis." Tex. Util. Code § 39.159(d). This express statutory exception, authorizing ERCOT rather than the PUC to develop a *specific* ancillary service for dispatchable reliability reserve service, further demonstrates that ERCOT *generally* cannot create new ancillary services.

[22] PURA § 35.004(h) does provide that "[t]he commission shall require the independent organization certified under Section 39.151 for the ERCOT power region to ***modify*** the design, procurement, and cost allocation of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis." (Emphasis added.) But this provision does not authorize ERCOT to *create* new ancillary services products in the first instance; that responsibility remains solely with the Commission per PURA § 35.004(e).

64

By allowing or purporting to authorize ERCOT to create the ECRS ancillary service, rather than having the PUC do so itself, the PUC Commissioners acted beyond or contrary to their statutory authority under PURA.

## CONCLUSION & PRAYER FOR RELIEF

As demonstrated above, the trial court does have jurisdiction over Aspire's claims challenging the validity of the ECRS Rules and the conduct of ERCOT and the PUC and its Commissioners in promulgating them. Aspire therefore respectfully prays that this Court reverse the trial court's orders granting the Amended Pleas to the Jurisdiction filed by ERCOT and the PUC Parties, and remand to the trial court with instructions that it adjudicate Aspire's claims on the merits.

Respectfully submitted,


/s/ Chrysta L. Castañeda

Chrysta L. Castañeda
  Texas Bar No. 15325625
  chrysta@castaneda-firm.com
Nicole Michael
  Texas Bar No. 24067767
  nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
  Texas Bar No. 00787881
  MLatin@ccsb.com
Brent M. Rubin
  Texas Bar No. 24086834
  BRubin@ccsb.com
Ken Carroll
  Texas Bar No. 03888500
  KCarroll@ccsb.com
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: (214) 855-3000
Fax: (214) 580-2641


*Attorneys for Appellant Aspire Power Ventures, LP*

**CERTIFICATE OF COMPLIANCE**

I certify pursuant to Tex. R. App. P. 9.4(i)(3) that this document complies with the length limitations of Rule 9.4(i) and the typeface requirements of Rule 9.4(e).

1. Exclusive of the contents identified by Rule 9.4(i)(1) and inclusive of all textboxes, footnotes, and endnotes, this document contains 9,787 words as counted by the Word Count function of Microsoft Word 2010.

2. This document has been prepared in proportionally spaced typeface using:

Software Name and Version: Microsoft Word 2010

Typeface Name: Century Schoolbook

Font Size: 14-point in text; 12-point in footnotes

*/s/ Ken Carroll*
Ken Carroll

CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of December, 2024, a true and correct copy of the foregoing Appellee's Brief has been served via the authorized electronic filing system on counsel of record for Appellees:

John R. Hulme
  John.Hulme@oag.texas.gov
Amanda Atkinson Cagle
  Amanda.Cagle@oag.texas.gov
Jordan Pratt
  Jordan.Pratt@oag.texas.gov
Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, TX 78711-2548

*Counsel for Appellees the Public Utilities Commission of Texas and its Chairman and Commissioners*

Elliot Clark
  eclark@winstead.com
Elin Isenhower
  eisenhower@winstead.com
WINSTEAD PC
600 W. 5th Street, Suite 900
Austin, TX 78701

*Counsel for Appellee ERCOT*

*/s/ Ken Carroll*
Ken Carroll

No. 15-24-00118-CV

COURT OF APPEALS FOR THE
FIFTEENTH DISTRICT OF TEXAS
AUSTIN, TEXAS

Aspire Power Ventures, LP,

*Appellant,*

v.

Public Utility Commission of Texas, Electric Reliability Council
of Texas, Thomas Gleeson, Lori Cobos, Jimmy Glotfelty,
Kathleen Jackson, and Courtney Hjaltman,

*Appellees.*

On Appeal from the 345th Judicial District Court
Travis County, Texas
Cause No. D-1-GN-24-003384
*Hon. Catherine A. Mauzy, Presiding*

TEX. R. APP. P. 38.1(k)
APPENDIX TO APPELLANT'S BRIEF

Tab A:     Order Granting PUC Parties' Amended Plea to the
           Jurisdiction, Appx.726

Tab B:     Order Granting ERCOT Amended Plea to the Jurisdiction,
           Appx.723

Tab C:     Tex. Gov't Code § 2001.003

Tab D:     Tex. Gov't Code § 2001.038

Tab E:     Tex. Util. Code § 35.004

Tab F:     Tex. Util. Code § 39.151

# TAB A

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION | § | TRAVIS COUNTY, TEXAS |
| OF TEXAS, ELECTRIC | § | |
| RELIABILITY COUNCIL OF | § | |
| TEXAS, THOMAS GLEESON, | § | |
| LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON, AND COURTNEY | § | |
| HJALTMAN | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

**ORDER GRANTING PUCT DEFENDANTS'
AMENDED PLEA TO THE JURISDICTION**

On this day, the Court considered the Amended Plea to the Jurisdiction filed by the Public Utility Commission of Texas ("PUCT" or "Commission") and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the PUCT (collectively, the "PUCT Defendants.") The Court, having considered the live pleadings and attached exhibits, and having also considered the arguments, exhibits and authorities urged by counsel, finds that the plea should be **GRANTED**.

Accordingly, it is **ORDERED** that all of Plaintiff's claims against the PUCT Defendants are **DISMISSED**, and therefore Plaintiff's entire suit against the PUCT Defendants is **DISMISSED**.

All other relief not expressly granted herein is denied.

SIGNED: _21 Oct. 2024_

_[signature]_

CATHERINE A. MAUZY
Judge Presiding

2

Appx. Page 727 of 740

# TAB B

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| AND COURTNEY HJALTMAN, | § | |
| *Defendants.* | § | 345TH JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANT ERCOT'S
## AMENDED PLEA TO THE JURISDICTION

On this day, the Court considered Defendant Electric Reliability Council of Texas, Inc.'s ("ERCOT") Amended Plea to the Jurisdiction (the "Plea"). After considering the Plea, Aspire Power Ventures, LP's ("Aspire") Response thereto, the Reply, the arguments of counsel, and all other matters properly before it, the Court has determined that the Plea is meritorious and should be **GRANTED.**

It is therefore **ORDERED** that the Plea is **GRANTED**, and that all claims asserted against ERCOT in the above-numbered cause are hereby **DISMISSED** for lack of jurisdiction.

Having determined that ERCOT's Plea should be granted and that jurisdiction is lacking, the Court does not reach ERCOT's Rule 91a Motion to Dismiss Aspire's Second Amended Petition.

Signed this ___21___ day of ___Oct___, 2024.

_____
HON. CATHERINE A. MAUZY
Judge Presiding

**Appx. Page 723 of 740**

**AGREED AS TO FORM**

**THE CASTAÑEDA FIRM**

Chrysta L. Castañeda      SBN 15325625
chrysta@castaneda-firm.com
Nicole Michael      SBN 24067767
nicole@castaneda-firm.com
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: 214-282-8579
Fax: 214-602-9187
and
Monica Latin      SBN 00787881
MLatin@ccsb.com
Brent M. Rubin      SBN 24086834
BRubin@ccsb.com
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Ph: 214-855-3000
Fax: 214-580-2641

**ATTORNEYS FOR PLAINTIFF**

/s/ *Elliot Clark*
Elliot Clark      SBN 24012428
eclark@winstead.com
Elin Isenhower      SBN 24104206
eisenhower@winstead.com
600 W. 5th Street, Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax

**ATTORNEYS FOR DEFENDANT
ELECTRIC RELIABILITY COUNCIL
OF TEXAS, INC.**

John R. Hulme      SBN 10258400
Assistant Attorney General
John.Hulme@oag.texas.gov
Amanda Atkinson Cagle   SBN 00783569
Assistant Attorney General
Amanda.Cagle@oag.texas.gov
Jordan Pratt      SBN 24140277
Assistant Attorney General
Jordan.Pratt@oag.texas.gov
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: 512-463-2012
Fax: 512-320-0911

**ATTORNEYS FOR DEFENDANTS
THE PUBLIC UTILITY COMMISSION
OF TEXAS, and THOMAS GLEESON,
LORI COBOS, JIMMY GLOTFELTY,
KATHLEEN JACKSON, and
COURTNEY HJALTMAN, in their
official capacities as Commissioners of
the Public Utility Commission Texas**

# TAB C

TITLE 10. GENERAL GOVERNMENT

SUBTITLE A. ADMINISTRATIVE PROCEDURE AND PRACTICE

CHAPTER 2001. ADMINISTRATIVE PROCEDURE

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 2001.001.  PURPOSE.  It is the public policy of the state through this chapter to:

(1)  provide minimum standards of uniform practice and procedure for state agencies;

(2)  provide for public participation in the rulemaking process; and

(3)  restate the law of judicial review of state agency action.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.

Sec. 2001.002.  SHORT TITLE.  This chapter may be cited as the Administrative Procedure Act.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.

Sec. 2001.003.  DEFINITIONS.  In this chapter:

(1)  "Contested case" means a proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing.

(2)  "License" includes the whole or a part of a state agency permit, certificate, approval, registration, or similar form of permission required by law.

(3)  "Licensing" includes a state agency process relating to the granting, denial, renewal, revocation, suspension, annulment, withdrawal, or amendment of a license.

(4)  "Party" means a person or state agency named or admitted as a party.

(5)  "Person" means an individual, partnership, corporation, association, governmental subdivision, or public or private organization that is not a state agency.

(6)  "Rule":

    (A) means a state agency statement of general applicability that:

      (i) implements, interprets, or prescribes law or policy; or

      (ii) describes the procedure or practice requirements of a state agency;

    (B) includes the amendment or repeal of a prior rule;  and

    (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

   (7) "State agency" means a state officer, board, commission, or department with statewide jurisdiction that makes rules or determines contested cases.  The term includes the State Office of Administrative Hearings for the purpose of determining contested cases.  The term does not include:

    (A) a state agency wholly financed by federal money;

    (B) the legislature;

    (C) the courts;

    (D) the Texas Department of Insurance, as regards proceedings and activities under Title 5, Labor Code, of the department, the commissioner of insurance, or the commissioner of workers' compensation; or

    (E) an institution of higher education.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by:
  Acts 2005, 79th Leg., Ch. 265 (H.B. 7), Sec. 6.007, eff. September 1, 2005.

# TAB D

GOVERNMENT CODE

TITLE 10. GENERAL GOVERNMENT

SUBTITLE A. ADMINISTRATIVE PROCEDURE AND PRACTICE

CHAPTER 2001. ADMINISTRATIVE PROCEDURE

SUBCHAPTER A. GENERAL PROVISIONS


Sec. 2001.038.  DECLARATORY JUDGMENT.  (a)  The validity or applicability of a rule, including an emergency rule adopted under Section 2001.034, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.

(b)  The action may be brought only in a Travis County district court.

(c)  The state agency must be made a party to the action.

(d)  A court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question.

(e)  An action brought under this section may not be used to delay or stay a hearing in which a suspension, revocation, or cancellation of a license by a state agency is at issue before the agency after notice of the hearing has been given.

(f)  A Travis County district court in which an action is brought under this section, on its own motion or the motion of any party, may request transfer of the action to the Court of Appeals for the Fifteenth Court of Appeals District if the district court finds that the public interest requires a prompt, authoritative determination of the validity or applicability of the rule in question and the case would ordinarily be appealed. After filing of the district court's request with the court of appeals, transfer of the action may be granted by the court of

appeals if it agrees with the findings of the district court concerning the application of the statutory standards to the action.  On entry of an order by the court of appeals granting transfer, the action is transferred to the court of appeals for decision, and the validity or applicability of the rule in question is subject to judicial review by the court of appeals. The administrative record and the district court record shall be filed by the district clerk with the clerk of the court of appeals.  The court of appeals may direct the district court to conduct any necessary evidentiary hearings in connection with the action.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.  Amended by Acts 1999, 76th Leg., ch. 894, Sec. 1, eff. Sept. 1, 1999.
Amended by: Acts 2023, 88th Leg., R.S., Ch. 459 (S.B. 1045), Sec. 1.10, eff. September 1, 2023.

# TAB E

UTILITIES CODE

TITLE 2. PUBLIC UTILITY REGULATORY ACT

SUBTITLE B. ELECTRIC UTILITIES

CHAPTER 35.  ENERGY PROVIDERS

SUBCHAPTER A. COMPETITION AND TRANSMISSION ACCESS IN THE
WHOLESALE MARKET


Sec. 35.004.  PROVISION OF TRANSMISSION SERVICE.  (a)  An electric utility or transmission and distribution utility that owns or operates transmission facilities shall provide wholesale transmission service at rates and terms, including terms of access, that are comparable to the rates and terms of the utility's own use of its system.

(b)  The commission shall ensure that an electric utility or transmission and distribution utility provides nondiscriminatory access to wholesale transmission service for qualifying facilities, exempt wholesale generators, power marketers, power generation companies, retail electric providers, and other electric utilities or transmission and distribution utilities.

(c)  When an electric utility, electric cooperative, or transmission and distribution utility provides wholesale transmission service within ERCOT at the request of a third party, the commission shall ensure that the utility recovers the utility's reasonable costs in providing wholesale transmission services necessary for the transaction from the entity for which the transmission is provided so that the utility's other customers do not bear the costs of the service.

(d)  The commission shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of

transmission, other than costs described by Subsections (d-2) and (d-3), divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region. An electric utility subject to the freeze period imposed by Section 39.052 may treat transmission costs in excess of transmission revenues during the freeze period as an expense for purposes of determining annual costs in the annual report filed under Section 39.257. Notwithstanding Section 36.201, the commission may approve wholesale rates that may be periodically adjusted to ensure timely recovery of transmission investment. Notwithstanding Section 36.054(a), if the commission determines that conditions warrant the action, the commission may authorize the inclusion of construction work in progress in the rate base for transmission investment required by the commission under Section 39.203(e).

(d-1)  The commission by rule shall establish a reasonable allowance for transmission-owning utility costs incurred to interconnect generation resources directly with the ERCOT transmission system at transmission voltage. The allowance must take into account:

(1)  the potential to reduce the costs to consumers of generation interconnection;

(2)  historical generation interconnection costs; and

(3)  any other factor that the commission considers reasonable to accomplish the goal of this subsection.

(d-2)  Costs in excess of the transmission-owning utility allowance provided by Subsection (d-1) incurred to interconnect generation resources with the ERCOT transmission system must be directly assigned to and collected from the generation resource interconnecting through the facilities.

(d-3)  Not later than September 1 of every fifth year, the commission shall review and may adjust the allowance provided by Subsection (d-1) to account for inflation or supply chain issues.

(e)  In this section, "ancillary services" means services necessary to facilitate the transmission of electric energy

including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule.

(f)  The commission shall ensure that ancillary services necessary to facilitate the transmission of electric energy are available at reasonable prices with terms and conditions that are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive.  On the introduction of customer choice in the ERCOT power region, acquisition of generation-related ancillary services on a nondiscriminatory basis by the independent organization in ERCOT on behalf of entities selling electricity at retail shall be deemed to meet the requirements of this subsection.

(g)  The commission shall:

(1)  review the type, volume, and cost of ancillary services to determine whether those services will continue to meet the needs of the electricity market in the ERCOT power region; and

(2)  evaluate whether additional services are needed for reliability in the ERCOT power region while providing adequate incentives for dispatchable generation.

(h)  The commission shall require the independent organization certified under Section 39.151 for the ERCOT power region to modify the design, procurement, and cost allocation of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis.

Acts 1997, 75th Leg., ch. 166, Sec. 1, eff. Sept. 1, 1997. Amended by Acts 1999, 76th Leg., ch. 405, Sec. 17, eff. Sept. 1, 1999;  Acts 2003, 78th Leg., ch. 295, Sec. 1, eff. June 18, 2003.
Amended by:
     Acts 2021, 87th Leg., R.S., Ch. 426 (S.B. 3), Sec. 14, eff. June 8, 2021.
     Acts 2023, 88th Leg., R.S., Ch. 410 (H.B. 1500), Sec. 9, eff. September 1, 2023.

# TAB F

UTILITIES CODE

TITLE 2. PUBLIC UTILITY REGULATORY ACT

SUBTITLE B. ELECTRIC UTILITIES

CHAPTER 39. RESTRUCTURING OF ELECTRIC UTILITY INDUSTRY

SUBCHAPTER D. MARKET STRUCTURE

Sec. 39.151.  ESSENTIAL ORGANIZATIONS.  (a)  A power region must establish one or more independent organizations to perform the following functions:

         (1)  ensure access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms;

         (2)  ensure the reliability and adequacy of the regional electrical network;

         (3)  ensure that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information;  and

         (4)  ensure that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.

    (b)  "Independent organization" means an independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller.

    (c)  The commission shall certify an independent organization or organizations to perform the functions prescribed by this section.  The commission shall apply the provisions of this section and Sections 39.1511, 39.1512, and 39.1515 so as to avoid conflict with a ruling of a federal regulatory body.

    (d)  The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among

generators and all other market participants, or may delegate those responsibilities to an independent organization. An independent organization certified by the commission is directly responsible and accountable to the commission.  The commission has complete authority to oversee and investigate the independent organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties.  The independent organization shall fully cooperate with the commission in the commission's oversight and investigatory functions.  The commission may take appropriate action against an independent organization that does not adequately perform the organization's functions or duties or does not comply with this section, including decertifying the organization or assessing an administrative penalty against the organization.  The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region. The commission may not implement, by order or by rule, a requirement that is contrary to an applicable federal law or rule.

(d-1)  The commission shall require an independent organization certified by the commission under this section to submit to the commission the organization's entire proposed annual budget.  The commission shall review the proposed budgets either annually or biennially and may approve, disapprove, or modify any item included in a proposed budget.  The commission by rule shall establish the type of information or documents needed to effectively evaluate the proposed budget and reasonable dates for the submission of that information or those documents.  The commission shall establish a procedure to provide public notice of and public participation in the budget review process.

(d-2)  Except as otherwise agreed to by the commission and an independent organization certified by the commission under this section, the organization must submit to the commission for review and approval proposals for obtaining debt financing or for refinancing existing debt.  The commission may approve, disapprove, or modify a proposal.

(d-3)  An independent organization certified by the commission under this section shall develop proposed performance measures to track the organization's operations.  The independent organization must submit the proposed performance measures to the commission for review and approval.  The commission shall review the organization's performance as part of the budget review process under Subsection (d-1).  The commission shall prepare a report at the time the commission approves the organization's budget detailing the organization's performance and submit the report to the lieutenant governor, the speaker of the house of representatives, and each house and senate standing committee that has jurisdiction over electric utility issues.

(d-4)  The commission may:

(1)  require an independent organization to provide reports and information relating to the independent organization's performance of the functions prescribed by this section and relating to the organization's revenues, expenses, and other financial matters;

(2)  prescribe a system of accounts for an independent organization;

(3)  conduct audits of an independent organization's performance of the functions prescribed by this section or relating to its revenues, expenses, and other financial matters and may require an independent organization to conduct such an audit;

(4)  inspect an independent organization's facilities, records, and accounts during reasonable hours and after reasonable notice to the independent organization;

(5)  assess administrative penalties against an independent organization that violates this title or a rule or order adopted by the commission and, at the request of the commission, the attorney general may apply for a court order to require an independent organization to comply with commission rules and orders in the manner provided by Chapter 15; and

(6)  resolve disputes between an affected person and an independent organization and adopt procedures for the efficient resolution of such disputes.

(e)  After approving the budget of an independent organization under Subsection (d-1), the commission shall authorize the organization to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget.  The commission shall investigate the organization's cost efficiencies, salaries and benefits, and use of debt financing and may require the organization to provide any information needed to effectively evaluate the reasonableness and neutrality of the fee or to evaluate the effectiveness or efficiency of the organization.  The commission shall work with the organization to establish the detail of information, both current and historical, and the time frames the commission needs to effectively evaluate the fee.  The commission shall require the organization to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget, taking into account the effect of a fee change on market participants and consumers, to ensure that the budget year does not end with surplus or insufficient funds.  The commission shall require the organization to submit to the commission, on a schedule determined by the commission, reports that compare actual expenditures with budgeted expenditures.

(e-1)  The review and approval of a proposed budget under Subsection (d-1) or a proceeding to authorize and set the range for the amount of a fee under Subsection (e) is not a contested case for purposes of Chapter 2001, Government Code.

(f)  In implementing this section, the commission may cooperate with the utility regulatory commission of another state or the federal government and may hold a joint hearing or make a joint investigation with that commission.

(g)  To maintain certification as an independent organization for the ERCOT power region under this section, an organization's governing body must be composed of persons selected by the ERCOT board selection committee.

(g-1)  The bylaws of an independent organization certified for the ERCOT power region must be approved by and reflect the input of the commission.  The bylaws must require that every member of the governing body be a resident of this state and must prohibit a legislator from serving as a member.  The governing body must be composed of:

(1)  two members of the commission as ex officio nonvoting members:

(A)  one of whom must be the presiding officer of the commission; and

(B)  one of whom must be designated by the presiding officer of the commission to serve a one-year term on the governing body;

(2)  the counsellor as an ex officio voting member representing residential and small commercial consumer interests;

(3)  the chief executive officer of the independent organization as an ex officio nonvoting member; and

(4)  eight members selected by the selection committee under Section 39.1513 with executive-level experience in any of the following professions:

(A)  finance;

(B)  business;

(C)  engineering, including electrical engineering;

(D)  trading;

(E)  risk management;

(F)  law; or

(G)  electric market design.

(g-2)  Members of the governing body are entitled to receive a salary for their service.

(g-3)  A person does not qualify for selection as a member of the governing body of an independent organization for the ERCOT power region if the person has a fiduciary duty or assets in the electricity market for that region.

(g-4)  To maintain certification as an independent organization under this section, the organization's governing body may not include more than two members who are employed by an institution of higher education, as defined by Section 61.003, Education Code, in a professorial role.

(g-5)  A former member of the governing body of an independent organization certified under this section may not, before the second anniversary of the date the member ceases to be a member of the governing body, engage in an activity that requires registration under Chapter 305, Government Code.

(g-6)  In this subsection, a reference to a protocol includes a rule.  Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval.  To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols.  The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols.  The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

Text of subsection as added by Acts 2023, 88th Leg., R.S., Ch. 464 (S.B. 2013), Sec. 4

(g-7)  To maintain certification as an independent organization under this section, the organization must:

(1)  identify all employee positions in the organization that are critical to the security of the electric grid; and

(2)  before hiring a person for a position described by Subdivision (1), obtain from the Department of Public Safety or a private vendor criminal history record information relating to the prospective employee and any other background information considered necessary by the independent organization or required by the commission.

Text of subsection as added by Acts 2023, 88th Leg., R.S., Ch. 410 (H.B. 1500), Sec. 15

(g-7)  The presiding officer of the commission shall designate commissioners to serve terms on the independent organization's governing body under Subsection (g-1)(1)(B) in the order in which the commissioners were first appointed to the commission.  A commissioner may not serve an additional term until each commissioner has served a term.

(h)  The ERCOT independent system operator may meet the criteria relating to the other functions of an independent organization provided by Subsection (a) by adopting procedures and acquiring resources needed to carry out those functions, consistent with any rules or orders of the commission.

(i)  The commission may delegate authority to the existing independent system operator in ERCOT to enforce operating standards within the ERCOT regional electrical network and to establish and oversee transaction settlement procedures.  The commission may establish the terms and conditions for the ERCOT independent system operator's authority to oversee utility dispatch functions after the introduction of customer choice.

(j)  A retail electric provider, municipally owned utility, electric cooperative, power marketer, transmission and distribution utility, or power generation company shall observe all scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, and procedures established by the independent system operator in ERCOT. Failure to comply with this subsection may result in the revocation, suspension, or amendment of a certificate as provided by Section 39.356 or in the imposition of an administrative penalty as provided by Section 39.357.

(j-1)  Notwithstanding Subsection (j) of this section, Section 39.653(c), or any other law, the independent system operator in the ERCOT power region may not reduce payments to or uplift short-paid amounts to a municipally owned utility that becomes subject to the jurisdiction of that independent system operator on or after May 29, 2021, and before December 30, 2021, related to a default on a payment obligation by a market participant that occurred before May 29, 2021.

(k)  To the extent the commission has authority over an independent organization outside of ERCOT, the commission may delegate authority to the independent organization consistent with Subsection (i).

(l)  No operational criteria, protocols, or other requirement established by an independent organization, including the ERCOT independent system operator, may adversely affect or impede any manufacturing or other internal process operation associated with an industrial generation facility, except to the minimum extent necessary to assure reliability of the transmission network.

(m)  A power region outside of ERCOT shall be deemed to have met the requirement to establish an independent organization to perform the transmission functions specified in Subsection (a) if the Federal Energy Regulatory Commission has approved a regional transmission organization for the region and found that the regional transmission organization meets the requirements of Subsection (a).

(n) An independent organization certified by the commission under this section is subject to review under Chapter 325, Government Code (Texas Sunset Act), but is not abolished under that chapter. The independent organization shall be reviewed during the periods in which the Public Utility Commission of Texas is reviewed.

(o) An independent organization certified by the commission under this section shall:

(1) conduct internal cybersecurity risk assessment, vulnerability testing, and employee training to the extent the independent organization is not otherwise required to do so under applicable state and federal cybersecurity and information security laws; and

(2) submit a report annually to the commission on the independent organization's compliance with applicable cybersecurity and information security laws.

(p) Information submitted in a report under Subsection (o) is confidential and not subject to disclosure under Chapter 552, Government Code.

Added by Acts 1999, 76th Leg., ch. 405, Sec. 39, eff. Sept. 1, 1999.
Amended by:
Acts 2005, 79th Leg., Ch. 797 (S.B. 408), Sec. 9, eff. September 1, 2005.
Acts 2011, 82nd Leg., R.S., Ch. 1232 (S.B. 652), Sec. 1.09(a), eff. June 17, 2011.
Acts 2013, 83rd Leg., R.S., Ch. 170 (H.B. 1600), Sec. 1.08, eff. September 1, 2013.
Acts 2019, 86th Leg., R.S., Ch. 509 (S.B. 64), Sec. 23, eff. September 1, 2019.
Acts 2021, 87th Leg., R.S., Ch. 425 (S.B. 2), Sec. 3, eff. June 8, 2021.
Acts 2021, 87th Leg., R.S., Ch. 908 (H.B. 4492), Sec. 3, eff. June 16, 2021.

Acts 2023, 88th Leg., R.S., Ch. 410 (H.B. 1500), Sec. 15, eff. September 1, 2023.

Acts 2023, 88th Leg., R.S., Ch. 464 (S.B. 2013), Sec. 4, eff. June 9, 2023.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 95464271
Filing Code Description: Brief Requesting Oral Argument
Filing Description: APPELLANTS BRIEF
Status as of 12/18/2024 3:10 PM CST

Associated Case Party: Aspire Power Ventures, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Chrysta L.Castaneda | | chrysta@castaneda-firm.com | 12/18/2024 2:53:38 PM | SENT |
| Nicole Michael | | nicole@castaneda-firm.com | 12/18/2024 2:53:38 PM | SENT |
| Monica Latin | | mlatin@ccsb.com | 12/18/2024 2:53:38 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 12/18/2024 2:53:38 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 12/18/2024 2:53:38 PM | SENT |

Associated Case Party: Public Utility Commission of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Hulme | | John.Hulme@oag.texas.gov | 12/18/2024 2:53:38 PM | SENT |
| Amanda AtkinsonCagle | | Amanda.Cagle@oag.texas.gov | 12/18/2024 2:53:38 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 12/18/2024 2:53:38 PM | SENT |

Associated Case Party: Electric Reliability Council of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Elin Isenhower | | eisenhower@winstead.com | 12/18/2024 2:53:38 PM | SENT |
| Elliot Clark | | eclark@winstead.com | 12/18/2024 2:53:38 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Laurent | | david.laurent@oag.texas.gov | 12/18/2024 2:53:38 PM | SENT |